Timothy M. Bechtold
Bechtold Law Firm, P.L.L.C.
PO Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CHARLES TAYLOR,<br><br>     Plaintiff,<br><br>vs.<br><br>CHAD WOLF, Acting Secretary,<br>United States Department of<br>Homeland Security; and US Customs<br>and Border Protection,<br><br>     Defendants. | **COMPLAINT AND JURY DEMAND** |

Plaintiff Charles Taylor ("Officer Taylor") alleges as follows:

## **NATURE OF THE CASE**

1. Plaintiff Charles Taylor brings this civil action pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, 42 U.S.C. §2000e, *et seq.*, 42 U.S.C. §1981a *et seq.*, the Americans with Disabilities Act of 1990, as amended (hereinafter "ADA"), 42 U.S.C. §12101,  the Rehabilitation Act

1

of 1973, 29 U.S.C. §791 *et seq.*,  and the Privacy Act, 5 USC §552a, for relief from Defendant's unlawful discrimination of Officer Taylor on the basis of his disability (physical) and his engagement in protected Equal Employment Opportunity (EEO) activity, during the course of his employment with United States Department of Homeland Security –US Customs and Border Protection ("CBP").

2.     CBP, a federal agency and Plaintiff's employer, discriminated against Plaintiff on the basis of his disability (physical) and his engagement in protected EEO activity during the course of his employment with CBP.

## PARTIES

3.     Plaintiff Charles Taylor is a resident and citizen of the State of Montana and is a United States citizen.  At all relevant times, he was an employee of the Department of Homeland Security – U.S. Customs and Border Protection.

4.     Defendant Acting Secretary Chad Wolf ("Defendant" or "Acting Secretary Wolf") is being sued in his official capacity as the Acting Secretary for the United States Department of Homeland Security

5.     Defendant US Customs and Border Protection is an agency of the Department of Homeland Security ("Agency" or "CBP").

6.     Defendant Wolf is directly liable for the discriminatory acts or omissions of his agents, servants, and employees while acting within the course and scope of employment, under the theory of *Respondeat Superior*.

## JURISDICTION

7.    This Court has jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. § 1343, 42 U.S.C. §1988, and 28 U.S.C. §1331, as the Complaint asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, the Rehabilitation Act of 1973, the ADA, and the Privacy Act.

## VENUE

8.    Venue in this case is proper under 28 U.S.C. § 1391 and LR 1.2. Lincoln County and Flathead County are located in the Missoula Division of the United States District Court for the District of Montana. The events giving rise to the claims in this case occurred in this judicial district.

## EXHAUSTION OF REMEDIES

9.    Plaintiff Charles Taylor has exhausted all of his administrative remedies as required by federal statute and regulation.

10.    On or around December 8, 2016, Officer Taylor timely contacted the Agency's EEO office and filed an informal EEO complaint with the Agency's EEO office. *See* Agency Case No. HS-CBP-00534-2017.

11.     On or around March 15, 2017, Officer Taylor timely filed a formal EEO complaint with the Agency's EEO office, which was investigated by the Agency. *See* Agency Case No. HS-CBP-00534-2017.

12.     After the investigation of his EEO complaint, Officer Taylor timely requested a Hearing before the United States Equal Employment Opportunity Commission ("EEOC").  *See* EEOC No. 550-2018-00116X.

13.     On or around January 24, 2018, Officer Taylor timely contacted the Agency's EEO office and filed a second informal EEO complaint with the Agency's EEO office. *See* Agency Case No. HS-CBP-00943-2018.

14.     On or around February 28, 2018, Officer Taylor timely filed a formal EEO Complaint with the Agency's EEO office, which was investigated by the Agency.  *See* Agency Case No. HS-CBP-00943-2018.

15.     After the investigation of his EEO complaint, Officer Taylor timely requested a Hearing before the United States Equal Employment Opportunity Commission ("EEOC").  *See* Agency Case No. HS-CBP-00943-2018.

16.     On October 8, 2019, the Administrative Judge remanded the case to the Agency for a Final Agency Decision (FAD). *See* EEOC No. 550-2018-00116X.

17.     Officer Taylor never received the Final Agency Decision for EEOC No. 550-2018-00116X.

18.    On or around November 6, 2019, Officer Taylor filed a Withdrawal of Hearing Request and Request for Final Agency Decision for Agency Case No. HS-CBP-00943-2018.

19.    On or around December 24, 2019, Officer Taylor received the Agency's Final Agency Decision for Agency Case No. HS-CBP-00943-2018, which provided him with 90 days from receipt of the final decision to file his lawsuit.

20.    Officer Taylor hereby timely files his action within 90 days from receipt of the FAD.

## **FACTS**

21.    Officer Taylor incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

22.    At all times relevant to the claims made herein, Officer Taylor was an employee of the U.S. Customs and Border Protection, in Roosville, Montana Port of Entry #3318, in the position of Customs and Border Protection Officer ("CBPO"), series 1895, GS-12/4.

23.    Officer Taylor has held this position since in or around April 2009.

24.    The Port Director, during all relevant times, was Richard Rowley; the Supervisory CPBOs included James Larter, until his retirement in 2017, Margaret Osborne, Richard Ayers, between 2015 and 2016, Arthur Mead, and Joseph Chevalier.

5

25.     In or around March 2012, Officer Taylor was in an off-duty all-terrain-vehicle accident and suffered a quadriplegic neck break at C6-C7.

26.     Officer Taylor was cleared to return to duty in or around December 2012, but continued to suffer from continuous nerve and muscle pain.

27.     In or around 2014, Officer Taylor was granted a reasonable accommodation whereby he was exempt from working mandatory overtime and his schedule was limited to 40 hours per workweek.

28.     Officer Taylor's disability (nerve and muscle pain) is permanent and as a consequence, he returns to his primary care doctor on an approximately quarterly basis.

29.     Officer Taylor takes medications approximately every six (6) hours to manage the pain, at the following times: 0600, 1200, 1800, and 2300 hours.

30.     Officer Taylor previously filed an EEO complaint, Agency Case No. CBP-255005-2016, which resulted in a settlement agreement.

31.     In or around October 2015, Officer Taylor requested an adjustment of his reasonable accommodation so that he could work some overtime when he felt he could handle it, but his request was denied by Michele M. James, Director of Field Operations, ES-1895-00, Seattle Field Office, Office of Field Operations, in November of 2015.

32.    In addition, Officer Taylor, along with other CBP officers and supervisor, started to wear load-bearing suspenders to help alleviate his nerve and muscle pain he suffered every day.

33.    Allegedly, according to the Agency, in May 2016, several CBPOs at the Port verbally complained to Port Director ("PD") Rowley that Officer Taylor was aggressive almost every day around 21:00 hours when taking medication.

34.    Officer Taylor denies this allegation and there is no documented proof of such an allegation ever being made.

35.    On or around May 24, 2016, PD Rowley testified that he specifically requested the CBPOs Ayers, Hickman, Larter, and Osborne provide him with any personal knowledge or report any complaints made against Officer Taylor.

36.    Officer Taylor was never issued any adverse records, counselings, or reprimands for any negative behavior on the job, including aggressiveness.

37.    All of Officer Taylor's performance evaluations up to the time of the alleged complaint in or around May 2016 were "fully successful" with no negative documentation.

38.    On or around July 26, 2016, Officer Taylor requested from PD Rowley that he be able to use load-bearing suspenders and provided CBP with a prescription to wear load-bearing suspenders due to his spinal injury, which would help him alleviate physical nerve and muscle pain.

39.    On August 10, 2016, Nurse Consultant Charlene Dawson, Human Resources, Medical Fitness Branch, confirmed *via* e-mail to APD Daniel Escobedo that she received the request for a Fitness for Duty Examination ("FFDE") with associated documents regarding Complainant's medical issue and "mood swings."

40.    On or about August 31, 2016, PD Rowley directed Officer Taylor to undergo a Fitness for Duty Exam, which was completed on September 20, 2016.

41.    The memorandum PD Rowley issued ordering Officer Taylor to undergo a FFDE specifically mentioned Officer Taylor's request for reasonable accommodation to wear load bearing suspenders.

42.    Officer Taylor passed the September 20, 2016 FFDE and there is no evidence that Officer Taylor was physically unable to fulfill his job duties.

43.    Nonetheless, on or around November 16, 2016, PD Rowley ordered Officer Taylor to undergo a second FFDE to include an Agency request that Officer Taylor see a neurologist.

44.    Nurse Consultant Dawson, who reviewed the FFDE requests for Officer Taylor, stated that the request for a psychiatric FFDE of Officer Taylor was *not* based on medical documentation, but rather on e-mails and memoranda from PD Rowley.

45.    Officer Taylor saw the neurologist, Dr. Lennard S. Wilson, on November 29, 2016.  During the examination, Dr. Wilson asked questions relating

to Officer Taylor's mental health and informed Officer Taylor that he, Dr. Wilson, was instructed to evaluate Officer Taylor's mental capabilities.

46.     Dr. Wilson, who conducted Taylor's FFDE neurological exam on November 29, 2016, stated in a December 22, 2016 addendum, that he found Officer Taylor fit for duty and recommended that Officer Taylor should be able to wear load-bearing suspenders.

47.     Dr. Danielle Grandimo, in a letter dated January 23, 2017, concurred with Dr. Wilson's recommendations regarding load-bearing suspenders.

48.     On or about February 25, 2017, Officer Taylor was ordered to undergo a third examination, this time a Psychiatric Medical Examination, which was scheduled for March 8, 2017.

49.     Dr. Stratford was the psychiatrist who performed the evaluation.  He also stated that Officer Taylor was fit for duty and was peer-reviewed by another doctor, Dr. Zincone, who agreed.

50.     Despite sending Officer Taylor to the three fit for duty examinations, the Agency ultimately found Officer Taylor fit for duty on April 4, 2017.

51.     A May 2, 2017 e-mail from Kenneth Huber ("Huber") to Kirsten Crawford ("Crawford") shows that the Agency Personal Appearance Standards ("PAS") request was only submitted as of May 2, 2017, despite management's

awareness that the doctor's note for the load-bearing suspenders was submitted in July 2016.

52.     Mr. Huber's May 2, 2017, e-mail clearly indicates that the July 2016 medical documentation submitted by Officer Taylor started an FFDE process but not a PAS process, even though management was aware there was an ongoing reasonable accommodation request to wear load-bearing suspenders.

53.     On or around May 19, 2017, Officer Taylor's request to wear load-bearing suspenders was finally approved by Director of Field Operations Michele James.

54.     On or about December 29, 2017, Supervisor CBPO Joe Chevalier implied that Officer Taylor should stay a few minutes past his scheduled shift, despite his previously approved reasonable accommodation limiting Officer Taylor to a 40-hour workweek.

55.     Officer Taylor's shift was scheduled to end at 1800.  Between 1630 and 1645, Supervisor CPBO Chevalier changed the primary shift rotation board so that Officer Taylor was working as "Primary" as backup to another officer on his first Primary hour, who had just started his swing shift at 1400.

56.     At around 1730, Supervisor CBPO Chevalier relieved the other officer, despite him being the Main Primary Officer, and Officer Taylor was required to work Primary until traffic reduced.

57.     When Supervisor CBPO Chevalier relieved the main Officer, there was no one permitting traffic to continue other than Officer Taylor, as there must always be at least one Officer working Primary traffic.

58.     Officer Taylor was informed of the change only after it had occurred and when he was up to relieve the backup primary officer.

59.     When Officer Taylor hurried to get out of work by his end of shift at 1800, Supervisor CBPO Chevalier told him that he did not think it to be a big deal for Officer Taylor to work overtime, despite knowing about his reasonable accommodation prohibiting overtime.

60.     On or about January 19, 2018, Officer Taylor complained to management, PD Rowley and Chief Hickman, about Supervisor CBPO Chevalier's words and actions that day.

61.     Specifically, Officer Taylor complained that he was being retaliated against by Supervisor CBPO Chevalier.

62.     On or about January 6, 2018, Officer Taylor learned that Supervisor CBPO Chevalier and Chief Hickman shared information with employees regarding Officer Taylor's written complaint about working after hours despite his reasonable accommodation, accused Officer Taylor of saying that certain officers left work early, and blamed Officer Taylor because employees could no longer leave their shifts early.

63.    Agriculture Specialist Wes Loughman informed Officer Taylor that CBPO Schultz, who is a friend of Supervisor CBPO Chevalier, had told Officer Loughman that Supervisor CBPO Chevalier was upset with Officer Taylor because Officer Taylor had written a complaint to management about the shift on December 29, 2017.

64.    Officer Loughman stated that Supervisor CBPO Chevalier planned to stop the "59 minute rule" because of Officer Taylor's complaint. The "59 minute rule" provides supervisors with discretion to release employees early (or arrive late) from their shifts and not be charged leave.

65.    That same day, January 6, 2018, Officer Taylor asked CBPO Kimmet if he had heard whether Officer Taylor was responsible for the "59 minute rule" being abolished and CBPO Kimmet confirmed that CBPO Schultz had told CBPO Kimmet that it was because Officer Taylor had complained to management.

66.    CBPO Campbell also confirmed that he had heard the same thing regarding Officer Taylor from CBPO Schultz.

67.    The following day, Officer Taylor learned from CBPO Chaney and CBPO Rosson that Chief Hickman had told them that the loss of the "59 minute rule" was because of Officer Taylor.

68.    On or about February 8, 2018, PD Rowley informed Officer Taylor *via* e-mail that his reasonable accommodation did not address Temporary Duty

Assignments ("TDY"), instead of granting his request to be exempt from mandatory TDYs.

69.    In the past, PD Rowley had denied Officer Taylor's requests for volunteer TDY assignments, citing his reasonable accommodation.

70.    However, PD Rowley claimed that Officer Taylor's reasonable accommodation does not address TDY assignments when Officer Taylor asked to be exempt from mandatory TDY assignments.

71.    Between February 4, 2018 and February 17, 2018, PD Rowley ordered Officer Taylor to work overnight shifts, despite Officer Taylor requesting not to do so and there also being other volunteers who wanted the overnight shifts when he did not.

72.    During this time, specifically fiscal year 2018, Officer Taylor was on a rotating schedule that included day and swing shifts.

73.    For the pay period including February 4, 2018, Officer Taylor was assigned a swing shift.

74.    CBPO Frampton had told management, including PD Rowley, that he wanted to work the overnight shift during that pay period.

75.    The reason that Officer Taylor did not want to work overnight shifts was because of his medications, which were prescribed to accommodate a regular sleep schedule occurring during overnight hours.

76.     On or about April 16, 2018, PD Rowley denied Officer Taylor for the opportunity to attend a TDY to Piegan Port of Entry, Montana.

77.     On April 14, 2018, Officer Taylor had asked PD Rowley if the TDY would require overtime.

78.     On April 16, 2018, PD Rowley told Officer Taylor that the TDY would require overtime.

79.     However, Officer Taylor asked CBPO Colleen Berry from Eastport, who was assigned to the Piegan TDY for the same time period if she had been required to work overtime, to which she responded that she had received no overtime during her shift there.

80.     Officer Taylor requested Fit for Duty (FFD) medical records four different times - on December 2, 2016, on December 19, 2016, on February 25, 2016 and on March 02, 2017 via telephone conversation. On December 20, 2016, Labor & Employee Relations (LER) Nicolle Bombardier responded, "The documentation still has not been released to management. Until such time as the final determination on your FFDE is rendered, the documents will not be released."

81.     On February 02,2017 CBP Nurse Consultant Charlene Dawson sent a memorandum to LER Bombardier that included all fit for duty medical records as of that date.

14

82.     On March 2, 2017, Officer Taylor spoke to LER Bombardier and again requested his medical documents be released to either himself or a doctor of his choice. She referred him to her email dated February 27, 2017: "With respect to the medical records from Dr. Wilson, those documents are not releasable at this time, as they are still with the Agency's Medical Branch. PD Rowley's letter was issued to you at the direction of the Medical Branch. Once a final determination has been rendered on your FFDE, you will be provided a full and complete copy of the medical report, to include all documentation obtained from North Country Medical Clinic, Dr. Lennard Wilson, and Dr. William Stratford."

83.     However, LER Bombardier's statement is both false and contrary to the Privacy Act.

84.     The Agency released the medical documents to Officer Taylor from his original FFDE exam, which occurred on October 17, 2016. Once the medical examination was complete, Officer Taylor requested and received the documents from that original October 17, 2016 FFDE.

85.     On December 28, 2016, at 1:48 PM Officer Taylor asked CBP management to identify any location where adverse records may exist. Management responded that documents shared with Officer Taylor that day were the only records kept and that no adverse records were present.

86.     CBP management knowingly withheld adverse records from Officer Taylor that CBP management knew to exist.

87.     On January 23, 2017, Dr. Grandrimo reviewed adverse records of Officer Taylor provided by CBP management and ordered a psychiatric examination based on the records.

88.     On September 12, 2017, CBP Nurse Consultant Dawson stated there was no medical reason for the psychiatric examination of Officer Taylor. Rather, the examination was based on adverse emails and memos provided by CBP management.

89.     The Privacy Act, 5 USC §552a, provides for access of personnel records upon request and the opportunity to request amendments of records. Pursuant to the Privacy Act, an agency must maintain records about an individual with accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual.

90.     In compliance with Privacy Act Access to Records and Agency Requirements, CBP's Collective Bargaining Agreement Article 9, Personnel Records, Section 3, Supervisory records, notes and diaries, states,

> C. Such records, notes or diaries shall not be used as the basis to support an unfavorable personnel action, or denial of such, unless the employee has been shown and provided a copy of such record, note or diary after it has been determined that the information will be used for such purpose, and before it is used.

16

91.    In compliance with Privacy Act provisions for Access to Records and

Agency Requirements, CBP's Collective Bargaining Agreement, Article 31,

Employee Rights, Section 9, states,

> **A.** An employee will be notified of a written complaint received by
> management. A complaint for the purpose of this section is defined as a
> written statement, including any oral complaints reduced to writing by
> the Agency, by an identified complainant indicating dissatisfaction with
> an employee by reason of conduct, appearance or carelessness or
> propriety of an action taken by the employee.

> **B.** Notification shall be provided by management as soon as practicable,
> normally within three business days, following the receipt of the
> complaint. Upon request, the employee shall be furnished with a copy of
> the complaint; or if the complaint involves more than one employee, that
> portion of the complaint related to the requesting employee. A copy of a
> written response by management will be furnished to the employee upon
> written request by the employee.

> **C.** The Agency will afford the employee a reasonable period of time in
> which to prepare and give to the Employer a response to the complaint,
> which will be considered before the Employer responds to the
> complainant. Upon request, the Employer will advise the employee of its
> response by providing a copy or summary.

92.    April 07, 2017 CBP Nurse Consultant Dawson presented LER

Bombardier with a Memorandum stating that Officer Taylor was found Fit for Duty

with no restrictions, along with his complete physical and psychiatric medical

records.

93.    On or after April 21, 2017, local CBP management Chief Hickman

hand delivered a complete, unsealed paper copy of Officer Taylor's physical and

psychiatric medical records to Officer Taylor.

94.    In a Memorandum dated September 30, 2018 from Privacy Officer

Debra Danisek to Officer Taylor, Privacy Officer Danisek quoted the following

portion from the Fit for Duty procedures:

> When LER provides reports to the manager, LER should remind him/her
> of the Privacy Act protection of medical information and the need to
> maintain its confidentiality. There may be a need to notify subordinate
> supervisors about work restrictions.  However, unless there is a good
> reason for subordinate supervisors to read the entire report, it should not
> be disclosed.  Since we are required to keep medical documentation in a
> separate medical file, inform the manager that the reports should be
> returned to you for filing.  Please note also that it is the responsibility of
> LER and/or Counsel's office to ensure that any employee requesting
> his/her FFDE reports are addressed appropriately.

95.    Privacy Officer Danisek continued:

The guidance provided by FFDE is also consistent with the *National
Collective Bargaining Agreement between U.S. Customs and Border
Protection and the National Treasury Employees Union* (October 1, 2017), of
which you are a member.  The NCBA requires that "In the event a medically
certified Agency representative provides medical information to CBP
management officials for the purpose of making an informed management
decision, the non-medically certified CBP management officials will only
review applicable summary medical information in which they have an
appropriate need to know." NCBA, Section 14.C. [page 160].  In light of these
extra protections for medical records, beyond the typical intra-Agency
Privacy Act "need to know" standard, we find that CBP policies are not clear
to whether and when an entire medical evaluation should be shared in full
with management.  Consistent with regulation, the FFDE procedures direct

that "unless there is a good reason for subordinate supervisors to read the entire report, it should not be disclosed."…LER Specialist Bombardier electronically shared the entire medical evaluation with the Roosville Port of Entry Management… we find that HRM guidance is vague as to when an entire medical evaluation file should be shared with management, and how management should distribute any of the medical records to supervisors with a need to know the information.

## CAUSES OF ACTION

### COUNT 1

### Rehabilitation Act

96.    Officer Taylor incorporates all paragraphs of this Complaint as if fully stated here.

97.    The acts of CBP as alleged above constitute violations of the Rehabilitation Act.

98.    CBP has discriminated against Officer Taylor by denying him reasonable accommodation for his disabilities, in violation of the Rehabilitation Act.

99.    As a result of the actions of CBP, Officer Taylor has suffered harm.

100.    CBP has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Officer Taylor.

101.    By reason of CBP's discrimination, Officer Taylor is entitled to all legal remedies available under the Rehabilitation Act.

102.    Attorney's fees should be awarded under 29 USC §794(a)(1).

# COUNT 2

## Americans with Disabilities Act

103.   Officer Taylor incorporates all paragraphs of this Complaint as if fully stated here.

104.   The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

105.   CBP discriminated against Officer Tayler as alleged above in violation of the ADA.

106.   The discriminatory actions included, but were not limited to, (1) limiting, segregating, or classifying Officer Taylor in a way that adversely affected his opportunities or status because of his actual or perceived disability within the meaning of §12112(b)(1); (2) utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability within the meaning of §12112(b)(3)(A); (3) not making reasonable accommodations for the known physical limitations of Officer Taylor, an otherwise qualified individual with a disability who was an employee, despite the fact that doing so would not impose

an undue hardship on the operation of the CBP's business within the meaning of §12112(b)(5)(A); (4) denying employment opportunities to Officer Taylor based on the CBP's need to make reasonable accommodations for his physical impairments within the meaning of §12112(b)(5)(A); and (5) using qualification standards, employment tests, or other selection criteria that screened out or tended to screen out individuals with disabilities, despite the fact that doing so was not consistent with business necessity, within the meaning of §12112(b)(6).

107.   As a result of the actions of CBP, Officer Taylor has suffered harm.

108.   Attorney's fees should be awarded under 42 USC §12205.

## COUNT 3

### Hostile and Abusive Working Environment

109.   Officer Taylor incorporates all paragraphs of this Complaint as if fully stated here.

110.   CBP's conduct as alleged above constitutes a hostile and abusive working environment in violation of Title VII, the Americans with Disabilities Act, and the Rehabilitation Act. The stated reasons for CBP's conduct were not the true reasons, but instead were a pretext to hide CBP's discriminatory animus.

## COUNT 4

### Reprisal for Engaging in Protected Activities

111.   Officer Taylor incorporates all paragraphs of this Complaint as if fully stated here.

112.   CBP's conduct as alleged above constitutes retaliation against Officer Taylor in violation of Title VII, the Americans with Disabilities Act, and the Rehabilitation Act. The stated reasons for CBP's conduct were not the true reasons, but instead were a pretext to hide CBP's retaliatory animus.

## COUNT 5

## Privacy Act Violations

113.   Officer Taylor incorporates all paragraphs of this Complaint as if fully stated here.

114.   The Privacy Act, 5 USC §552a, provides for civil remedies for violations of the Act.

115.   CBP failed to provide Officer Taylor with access to his records as required by the Privacy Act.

116.   CBP unlawfully provided access to Officer Taylor's records to unauthorized and unnecessary individuals.

117.   Officer Taylor suffered harm from these violations of the Privacy Act.

118.   Attorney's fees should be awarded under 5 USC §552a(g).

## **PRAYER FOR RELIEF**

Wherefore Officer Taylor requests that the Court enter judgment in his favor

containing the following relief:

1. A declaratory judgment that the actions, conduct, and practices of Defendant

   and agents as alleged above violate the laws of the United States;

2. An injunction and order permanently enjoining Defendant and agents from

   engaging in such unlawful conduct;

3. Compensatory damages;

4. Reasonable attorney's fees and costs;

5. Other further relief as deemed just.


## **JURY DEMAND**

Officer Taylor demands a trial by jury on all issues so triable.

DATED this 20th day of March, 2020.


/s/Timothy M. Bechtold
Attorneys for Plaintiff